Catherine A. Ganley
vs.　　　　　　No. 85009.
Yellow Cab Company

Patrick J. Ganley
vs.　　　　　　No. 86468.
Yellow Cab Company

February 14, 1933.

CAPOTOSTO, J. Two suits for negligence: one by the wife for personal injuries; the other by the husband for medical expenses and consequential loss. The jury returned a verdict of $3500 for the wife, and for $1500 in

the case of the husband. The defendant filed a motion for a new trial in each case, claiming that the verdict is against the weight of the evidence and, further, that it has discovered new evidence which seriously affects the finding of the jury.

The versions of the occurrence as given by the respective parties cannot be reconciled. The accident happened near the intersection of Westminster and Dean streets in the City of Providence shortly after 9 P. M. of Saturday, September 13, 1930. It was a pleasant evening. At the intersection in question there is a stop and go light.

The plaintiff claims that she and her daughter, Mrs. Catherine O'Gara, became passengers in a taxicab of the defendant on Mathewson street; that the cab swung into Westminster street and proceeded up that street at a fast rate of speed without slowing down at any intersection, which included among others, Snow, Empire, Greene, Jackson and Franklin streets as well as Cathedral Square; that on the way up Westminster street the plaintiff, a lady over sixty years of age, told her daughter to speak to the driver to slow down, that she did so but the request remained unheeded; that another automobile was some distance ahead of the cab, proceeding in the same direction and discernible by its tail light; that no other vehicle of any kind cut in between this automobile and the cab, and that when the cab was near the corner of Dean street, it drove into the automobile in front with an awful noise, threw the plaintiff forward off her seat and caused her to strike with her shin against one of the folding seats in front. She complained of an ulcerous condition of the leg at the point of contact, nervousness and other general symptoms, including some impairment of sight. The plaintiff and her daughter did not recall seeing any parked cars along Westminster street that Saturday night and were not aware of any car in back of the cab.

They further stated that the car in front which had been hit by the cab with a "terrible crash" continued on its way after the collision without stopping to see what had happened.

The defendant's version was quite different. The cab driver said that he proceeded up Westminster street at varying speeds from fifteen to eighteen miles an hour; slowing down at intersections; that he was not spoken to by either occupant of the cab; that there was a car in front and another in back of him; that there were cars parked all along the right side of Westminster street; that, as he was approaching Dean street at a speed of about fifteen miles, a car suddenly turned from the right curb immediately in front of his cab; that to avoid striking this car he applied his brakes, came to a dead stop, and was hit by the car in back. He further stated that he pulled across the intersection to a space at the curb, stopped, looked at his cab, went back to the corner to get the number of the car that had struck him in the rear, but was unsuccessful because the driver of that car apparently had made a right turn into Dean street and sped away. There was no damage either to the front or the rear of the cab.

These naked facts as stated by the respective sides tend to support the defendant's version. From experience and common sense it is difficult to believe that any car can proceed along Westminster street from Mathewson to Dean street at a high rate of speed without slowing down at any intersection, especially when we consider the crossings of Empire street and Cathedral Square. Again, it is quite imaginary for any one to try and convey the impression, directly or by implication, that there were no cars parked on the right hand side of Westminster street on that Saturday evening. Still again, it is contrary to ordinary human nature for the driver of a car which is

hit from behind with an "awful noise," or "terrible crash," to proceed on his way without stopping to see who and what had struck him. Such action is more likely to come from one who has done the striking rather than from one who has been struck.

The facts as to the accident itself were testified to by the plaintiff and her daughter on the one side, and by the driver of the cab on the other. The driver left the defendant's employ on January 1, 1931, and has been unemployed ever since. All may be said to be interested parties. The real issue simmers down after all to a question of credibility. Let us, therefore, see how the plaintiff's case fares in the light of this scrutiny.

On September 17, 1930, four days after the accident, a Mr. Kiernan, representing the defendant, called at the plaintiff's residence and took a signed written statement from Mrs. O'Gara, which is in evidence as defendant's Exhibit 1. This statement is in direct conflict on a number of material points with Mrs. O'Gara's testimony in court. Three instances of these variations are as follows: In the statement she says that the driver "drove at a moderate rate of speed;" in court, she said his speed was at least 35 miles an hour; to Mr. Kiernan she says nothing about warning the driver to go slower; on the witness stand she says that she told the driver to go "a little slower" because her mother was nervous; above her signature she states that she "cannot say whether or not cab was hit in rear or in the front;" as a witness she testifies that the cab ran into the "machine in front" with a terrible crash. She seeks to avoid the force of these and other contradictions by saying that Mr. Kiernan claimed he was in a hurry, that she was rushed in giving her statement, that he did not read the statement to her, and

that, although she understood she was signing a detailed account of the accident, she signed the statement without reading it herself.

Mr. George A. Ganley, son of the plaintiff and brother of Mrs. O'Gara, not only testified in support of his sister's claim but went further and said that when the statement was given to his sister to sign, he noticed, by his looking over her shoulder, that the paper was "not entirely filled out;" that there were "vacant spaces;" that there were "lines skipped" but could not say where the blanks were. Although counsel for the plaintiff skilfully attempted to avoid the full force of this statement by attacking both Mr. Kiernan's method and his wording in certain instances, yet the writing remained as a damaging bit of evidence challenging the veracity of Mrs. O'Gara.

The explanation given by the witness and her brother was not convincing. Neither Mrs. O'Gara nor her brother were uneducated. They were both accustomed to business transactions. Mrs. O'Gara and Mr. George A. Ganley were bookkeepers. It is hard to believe that either would sign a statement for any one without reading it or at least having it read, and still harder to think that one would sign and the other would let his sister sign a paper which was not entirely filled out, with vacant spaces and with lines skipped. An examination of the statement itself shows an evenness of writing and of spacing, which is inconsistent with such a conclusion. All things considered, it leads to the suspicion that this was a rash and desperate attempt to deceive themselves, if not to deceive others. This phase of the case tended to raise a serious doubt as to the reliability of the testimony for the plaintiff.

Mrs. O'Gara was a positive witness in all her assertions. In addition to testifying about the accident itself, she

unequivocally stated that in January, 1931, she gave up her position as book-keeper at a salary of twenty-five dollars a week with the Short Line Motor Freight, Inc., to take care of her mother upon her father's promise to pay her the same sum for such care. The distinct impression which she conveyed to the Court and undoubtedly to the jury was that she gave up an existing remunerative employment to attend to the needs of her mother and the household in general. The case went to the jury with this thought clearly affirmed as a fact by Mrs. O'Gara. Since the trial, the defendant has filed an affidavit which gives an entirely different view to the situation. The statement of Donald V. Grant, sworn to in Newport on January 23, 1933, states that in January, 1931, he was Assistant Treasurer of the Short Line Motor Freight, Inc.; that Mrs. O'Gara had been employed as a book-keeper for the company for the period of approximately one year and operated an Elliott-Fisher bookkeeping machine; that "early in January, 1931, the type of work done on this machine was transferred to our Springfield, Massachusetts, office, and as a result Mrs. O'Gara was discharged;" and that at that time the company gave her a written reference for future employment.

Mrs. O'Gara attempts to counteract the force of Mr. Grant's statement by an affidavit of her own in which she states that "I terminated my services with the Short Line Motor Freight, Inc., on January 3, 1931" and then goes on to say that she had opportunity for employment with other concerns which she had to refuse on account of her mother's condition. Two other affidavits, both by officials of the Elliott-Fisher Company, were filed by the defendant in corroboration of Mrs. O'Gara's statement that other employment had been offered her during the period she claims to have been caring for her mother.

The affidavit of Mr. Grant is of great significance, because it directly contradicts Mrs. O'Gara on the material question of damages, and reflects further doubt upon her evidence with reference to the accident itself. Mrs. O'Gara's counter affidavits beg the question. The issue raised by the defendant through Mr. Grant's affidavit is Mrs. O'Gara's truthfulness as a witness, not whether or not she had opportunity for employment after January 1, 1931. No person of ordinary reason or education can confuse a discharge with a voluntary retirement from employment, nor will such a person testify under oath in Court in a way to convey the distinct impression that her mother's condition obliged her to voluntarily leave her work when, as a matter of fact, she had been dismissed because of reorganization of her employer's affairs.

The ingenious and able argument of counsel for the plaintiff in resisting the granting of a new trial sounded to the Court as a plea in confession and avoidance. Granting, he says in substance, that Mrs. O'Gara and her brother were "mistaken" about various matters, yet the verdict should not be disturbed because there still remains the testimony of the plaintiff herself. Furthermore, he states: the affidavit of Mr. Grant is upon a collateral point and even if the facts are true it would not affect the verdict. There is no intention on the part of the Court to cast any reflections upon the elderly plaintiff, Mrs. Ganley, a motherly appearing woman. It cannot, however, overlook the fact that her testimony was indefinite and nebulous at important points. The back-bone of the plaintiff's case centered around Mrs. O'Gara and her brother George. The veracity of both deserves close scrutiny, especially since Mrs. O'Gara's evidence has been seriously challenged by Mr. Grant's affida-

vit. Just as a drop of oil will spread over the surface of water, so will a misstatement intentionally or recklessly made infect the entire testimony of a witness. A person's credibility is sometimes affected by the most trivial incident.

The Court feels that in view of all the circumstances disclosed both at the trial and since, the defendant is entitled to a new trial in each case.

Motion for new trial granted in each case.

For plaintiffs: Stephen J. Casey, Cooney & Cooney.

For defendant: McGovern & Slattery, Fred Perkins.